WILLIAMS, J.
 

 hln this child custody dispute, the father, Robert Keith Semmes, IV (“Bobby”), appeals a trial court judgment granting primary domiciliary custody of 'the minor child to the mother, Carrie Kennedy Sem-mes (“Carrie”). He also challenges the lower court’s ruling with regard to visitation, child support and its designation of
 
 *1027
 
 Carrie as the parent entitled to claim the income tax dependency deduction for the minor child. For the following reasons, we affirm.
 

 FACTS
 

 Bobby and Carrie were married on June 24, 1994. Of the marriage, one child, Emma, was born on December 21, 2000. Carrie filed a petition for divorce on June 7, 2005, requesting joint custody of Emma.
 
 [1]
 
 While the divorce was pending, the parties entered into a joint stipulation/consent judgment whereby they agreed to be “co-domiciliary” parents. The custodial/visitation schedule read as follows:
 

 1. RECURRING CUSTODIAL/VISITATION PERIODS: The parties will share custody of the [child] on an alternating basis wherein the parents will alternate the custody of the child on Monday-Tuesday and Wednesday-Thurs with the parent who has the child on Monday-Tuesday of week one to have [custody of the child] Wednesday-Thursday of week two. The parties will alternate the weekends, consisting of Friday through Sunday. The objective of the parties is that each parent will have alternate weekends with the child and neither parent will go more than three consecutive days without having physical custody of the child.
 

 [[Image here]]
 

 The parties also agreed to alternate holidays with the child, and Bobby | ¡.agreed to pay child support in the amount of $865.48 per month. Additionally, the parties agreed that Carrie would claim Emma as a dependent for state and federal income tax purposes in odd numbered years, and Bobby would claim Emma as a dependent in even numbered years. The trial court entered a consent judgment, ratifying the joint stipulation on September 21, 2005.
 

 Thereafter, on January 14, 2008, Bobby filed a rule to modify child custody and child support. In the petition, Bobby requested that he and Carrie continue to “maintain the equal sharing of time with the minor child, with less transfer.” More specifically, Bobby requested the following: (1) a modification of the joint custody agreement, whereby Emma would spend one week with him and one week with Carrie, “alternating weeks thereafter;” (2) a modification of his child support obligation; and (8) the right to claim Emma as a dependent for federal and state income tax purposes every year.
 

 Carrie filed a response to Bobby’s petition, alleging that an arrangement of alternating weekly custody of Emma, as proposed by Bobby, would “still cause turmoil and be disruptive for the child, who is only seven years of age.” Carrie also objected to Bobby’s request that he be allowed to claim Emma as a dependent for income tax purposes each year. In the same pleading, assuming the position of plaintiff-in-rule, Carrie filed a counter-rule to modify custody and increase child support. Carrie requested the following: (1) that she be designated primary domiciliary parent; (2) that Bobby be awarded visitation every other weekend during the school year |sand three weeks during the summer; and (3) that child support be increased according to the child support guidelines because Bobby “is making substantially more income than he was at the time the previous ‘Joint Stipulation and Consent Judgment’ was signed and filed.”
 

 On February 25, 2008, Bobby filed a first supplemental and amended rule, requesting that he be named domiciliary parent “in the alternative, and solely in the
 
 *1028
 
 alternative, in the event this Honorable Court finds that alternating weeks of custody is not in the best interest of the minor child, and that she should reside with one party during the school term....”
 

 A hearing officer conference was held on March 10,2008. At the request of counsel, the trial court appointed a psychologist, Dr. John Simoneaux, to perform a custody evaluation in this case. Dr. Simoneaux evaluated Emma, the parties and the current spouses of the parties. Dr. Simo-neaux opined that a custody agreement, whereby the parents exchanged custody on a weekly basis, would not be disadvantageous to Emma. Dr. Simoneaux stated:
 

 The advantage in this case is that Emma is such a resilient, happy, healthy child. She probably will do okay in any circumstance. It would be difficult to say that moving to her mother’s house would be so upsetting to Emma as to cause her extreme disruption. Emma is a bright child who will do well in any school; she will excel in any social environment, etc.
 

 * * *
 

 The best thing for children of divorce is to inject as much consistency and stability in their life [sic] as possible. Emma keeps up with the current custody regime better than her parents do. She knows where she should be from one day to the next and has adjusted fairly well. I will say, however, that the number of exchanges that take place is potentially problematic....
 

 * * *
 

 |4I do understand concerns about a 50/50 custody split with weekly exchanges. I do not think it is good for a child to go that long without seeing the other parent. Therefore, when weekly custody splits are part of a custody regime, I typically recommend that there be a mid-week visit with the other parent.
 

 * * *
 

 I do believe that this child could tolerate a seven day custody split.
 

 ⅜ * *
 

 Another hearing officer conference was held on January 7, 2009. In accordance with Dr. Simoneaux’s report, the hearing officer issued a recommendation that Bobby and Carrie alternate custody of Emma every other week, with a midweek visit for the parent without physical custody for a particular week. The hearing officer also recommended that Bobby be ordered to pay child support in the amount of $183 per month. Additionally, the hearing officer recommended that each of the parties would claim Emma as a dependent for income tax purposes, on an alternating basis, every other year.
 

 Carrie filed an objection to the hearing officer’s report. On January 29, 2009, the trial court signed an interim order, making the hearing officer’s report the interim order of the court pending final disposition.
 

 Following a three-day hearing in April and May of 2009, the trial court granted the parties joint custody of Emma and designated Carrie as the primary domiciliary parent. Bobby was granted visitation every other weekend and approximately seven weeks during the summer. The court granted Carrie “the right to enroll [Emma] in Grace Episcopal School” at Carrie’s expense. The court also awarded Carrie the right to claim “the dependency exemption for the minor child on her income tax returns for |fieach and every year....” Additionally, the court ordered Bobby to pay child support in the amount of $687 per month, with a reduction in the child support obligation for the months of June and July to $350 per month. Bobby appeals.
 

 
 *1029
 
 DISCUSSION
 

 Child Custody
 

 Bobby contends the district court erred in awarding primary domiciliary custody to Carrie and in limiting his visitation to every other weekend and six weeks out of each summer. He also argues that the trial court disregarded Dr. Simoneaux’s opinion that “a 50/50 custody split with weekly exchanges,” and a midweek visitation, would be appropriate in this case.
 

 It is well settled in our statutory and jurisprudential law that the paramount consideration in any determination of child custody is the best interest of the child. LSA-C.C. art. 131;
 
 Evans v. Lungrin,
 
 97-0541 (La.2/6/98), 708 So.2d 731;
 
 Shivers v. Shivers,
 
 44,596 (La.App.2d Cir.7/1/09), 16 So.3d 500. The court is to consider all relevant factors in determining the best interest of the child. LSA-C.C. art. 134.
 
 [2]
 

 |fiThe trial court is not bound to make a mechanical evaluation of all of the statutory factors listed in LSA-C.C. art. 134, but should decide each case on its own facts in light of those factors.
 
 Robert v. Robert,
 
 44,528 (La.App.2d Cir.8/19/09), 17 So.3d 1050,
 
 writ denied,
 
 2009-2036 (La.10/7/09), 19 So.3d 1;
 
 Bergeron v. Bergeron,
 
 44,210 (La.App.2d Cir.3/18/09), 6 So.3d 948. These factors are not exclusive, but are provided as a guide to the court, and the relative weight given to each factor is left to the discretion of the trial court.
 
 Id.
 

 LSA-R.S. 9:335(A)(2)(b) provides that to the extent feasible and in the best interest of the child, physical custody of the child should be shared 17equally. Yet, when the trial court finds that a decree of joint custody is in the best interest of the child, the statute does not necessarily require an equal sharing of physical custody.
 
 Stephenson v. Stephenson,
 
 37,323 (La.App.2d Cir.5/14/03), 827 So.2d 175;
 
 Hodnett v. Hodnett,
 
 36,532 (La.App.2d Cir.9/18/02), 827 So.2d 1205. Substantial time, rather than strict equality of time, is mandated by the legislative scheme providing for joint custody of children.
 
 Id.
 

 The trial court has vast discretion in deciding matters of child custody and visitation.
 
 Slaughter v. Slaughter,
 
 44,056 (La.App.2d Cir.12/30/08), 1 So.3d 788;
 
 Gaskin v. Henry,
 
 36,714 (La.App.2d Cir.10/23/02), 830 So.2d 471. This discretion is based on the trial court’s opportuni
 
 *1030
 
 ty to better evaluate the credibility of the witnesses.
 
 Slaughter, supra; McCready v. McCready,
 
 41,026 (La.App.2d Cir.3/8/06), 924 So.2d 471. Therefore, the trial court’s determination will not be disturbed on appeal, absent a clear showing of an abuse of discretion.
 
 Bergeron v. Bergeron,
 
 492 So.2d 1193 (La.1986);
 
 Slaughter, supra; Cooper v. Cooper,
 
 43,244 (La.App.2d Cir.3/12/08), 978 So.2d 1156. As long as the trial court’s factual findings are reasonable in light of the record when reviewed in its entirety, the appellate court may not reverse even though convinced it would have weighed the evidence differently if acting as the trier of fact.
 
 Id.
 

 In the instant case, all of the witnesses testified that Emma is a bright, well-adjusted child and is flourishing academically and socially. Both Carrie and Bobby testified that they are good parents to Emma.
 

 Carrie testified that the custody arrangement whereby she and Bobby ^exchanged custody of Emma several times a week had become increasingly difficult. She stated the frequent transfer of custody was causing turmoil for her, Bobby and Emma. Carrie opined that Emma’s needs and activities changed as she became older; therefore, the child’s need for structure and stability had increased. Carrie also testified that she is very active in Emma’s school-related activities as well as her extracurricular activities. She stated that she arranges most of Emma’s doctors’ appointments and extracurricular activities, with the exception of softball. She stated that she attends all of Emma’s school programs, field trips, cheerleading competitions, gymnastics events and softball games. Carrie was complimentary of Bobby’s relationship with Emma; however, she testified with regard to her frustration with Bobby’s frequent refusal to communicate with her concerning Emma. She stated that her attempts to communicate with Bobby via telephone, text messaging or email were largely ignored.
 

 Bobby testified that he was no longer satisfied with the frequent transfers of custody. He stated that Emma needed more stability, which he felt would be achieved if she was allowed to stay in each of her parents’ homes for longer periods of time. He also testified that Emma attends a school which is in close proximity to his home and he frequently visits the school to eat lunch with her. Bobby further testified that he attends Emma’s school programs, field trips, cheerleading competitions and gymnastics events and that he coaches her softball team. Bobby admitted that he often did not respond to Carrie’s telephone calls, text messages or emails because he did not feel they were important. Bobby admitted that he did not always 19know why Carrie was calling because he did not have a voice mailbox established on his cellular phone; therefore Carrie was not able to leave messages. Although Bobby complained about not being notified of all of Emma’s doctor’s appointments, he admitted that when he saw missed calls from Carrie on his cellular phone, he did not know whether or not the calls were attempts to notify him of those appointments.
 

 The parties’ current spouses, Emma’s teacher and various family members, neighbors and friends also testified. The consensus of the testimony indicated that both parents love Emma and are very attentive to her needs. All of the witnesses expressed positive regard for Carrie’s maternal abilities and were complimentary of Bobby’s relationship with Emma. However, several witnesses testified that Emma’s demeanor changed and she seemed nervous and withdrawn when both of her parents and stepparents were present. Carrie, her current husband and her mother testified that they had ob
 
 *1031
 
 served that Emma was more reserved and less affectionate with them when Bobby was present.
 

 After weighing the factors set forth in LSA-C.C. art. 134, the trial court concluded that Bobby and Carrie were both “fit and loving parents.” However, the court found that “shared custody is unworkable in light of the attitude of Mr. Semmes.” The court stated:
 

 [T]he Court finds that the tie-breaker in this case has to do with the Court’s understanding of the attitude of the parents, as that attitude would impact the child’s upbringing.... Among the reasons for the Court reaching its conclusion is that its impression from the testimony, having to do with the father’s inflexibility concerning his rights of visitation causes him to appear to see Emma as property much in the nature of a trophy [ 1(lwhich he insists upon having on his shelf when he is due to have it, no matter what, but this child is not a thing — she is a living, breathing precious human being. Additionally, the Court accepts the testimony of Carrie that she has not been able to communicate effectively with Bobby, because he often will not respond to her communication efforts.... Bobby himself admits that he often does not respond to her attempts to communicate with him, but also says that he doesn’t respond to attempts by others to communicate with him at times. The Court hardly sees how his admission that he doesn’t return other people’s attempts to communicate with him helps him at all in this matter. The Court finds that the need for communication is great in light of the child’s age and activities....
 

 [[Image here]]
 

 The Court credits the testimony of the witnesses who testified that Emma appears to be ill-at-ease, nervous or withdrawn when Bobby, [his current wife], Carrie and [her current husband] are all together. From this Court’s study of Dr. Simoneaux’s report on these people, and the Court’s study of the evidence, the Court is of the view that a fair part of this child’s uneasiness is due to uncertainty about how her Dad will act on these occasions.
 

 In observing the mother and father of this child during the court proceeding and during testimony, the Court is left with the distinct impression that shared custody is unworkable in light of the attitude of Mr. Semmes. Instead, one of the parents needs to be designated as the primary custodial parent, who will have the obligation of communicating with the other parent concerning all matters related to the child’s health, school, activities and the like. But one parent needs to be in a position to make a decision concerning matters if the other parent does not agree. Carrie will be that parent; she is clearly the best choice between the two.
 

 [[Image here]]
 

 Additionally, the court expressed its concern about Bobby’s behavior on occasions, describing Bobby’s conduct as “totally unreasonable.” The court also described Bobby as “very controlling” and stated, “[S]uch inflexibility is unhelpful and is indeed frustrating.”
 

 InBased on the record before us, we find that the trial court did not abuse its discretion in awarding primary domiciliary custody of Emma to Carrie, or in failing to award Bobby “equal time” visitation. The trial court observed the demeanor of the parties and clearly concluded that Carrie was sincere with regard to her willingness to work with Bobby concerning Emma’s needs. Additionally, the court found that Carrie would be the parent who would ensure that Emma had significant and fre
 
 *1032
 
 quent contact with Bobby. The trial court expressly noted that Bobby had demonstrated an unwillingness to communicate with Carrie with regard to Emma’s needs throughout the shared custody arrangements.
 

 We also find that Bobby’s argument that the trial court ignored Dr. Simoneaux’s recommendation is without merit. The trial court clearly considered the report, but noted that it is the court’s responsibility to make a custody determination based upon the best interest of the child. The court correctly stated, “Experts do not get to make such important decisions, but their recommendations are sometimes helpful.”
 

 Designation of Elementary School
 

 Bobby also contends the trial court erred in allowing Carrie to remove Emma from public school and enroll her in a private school which was affiliated with a religion that differs from that of the parties. Bobby argues that Emma has attended her current school since kindergarten and should not be enrolled in a different school.
 

 When parties are awarded joint custody, the court shall designate a domiciliary parent unless the implementation order provides otherwise or | iafor other good cause shown. LSA-R.S. 9:335(B)(1). The domiciliary parent shall have authority to make all decisions affecting the child unless an implementation order provides otherwise. All major decisions made by the domiciliary parent are subject to judicial review upon motion by the nondomiciliary parent. LSA-R.S. 9:335(B)(3). During judicial review, it is presumed that all major decisions made by the domiciliary parent are in the best interest of the child and the burden of proving that they are not in the best interest of the child is placed on the non-domiciliary parent who opposes the decision.
 

 The naming of a domiciliary parent in the joint custody decree, without more, produces three legal results: (1) the child shall primarily reside with that parent; (2) the other parent has physical custody during time periods that assure that the child has frequent and continuing contact with both parents; and (3) the decision making authority of LSA-R.S. 9:335(B)(3) applies.
 
 Stephenson, supra,
 
 citing Kenneth Rigby,
 
 1993 Custody and Child Support Legislation,
 
 55 La.L.Rev. 103 (1994).
 

 In the instant case, the legal presumption that Carrie’s decision to enroll Emma in Grace Episcopal School, a private school, was in Emma’s best interest applies. Bobby submitted no proof to overcome this presumption. Although the evidence presented showed that Emma had thrived at Kiroli Elementary School, that school is not located within the school district in which Emma will be primarily living with Carrie. The evidence, including Dr. Simoneaux’s report, indicates that Emma is an intelligent child and could succeed at any school. Therefore, in the absence hsof evidence showing that Emma’s attendance at Grace Episcopal School is not in her best interest, we find that the legal presumption in favor of Carrie’s choice of school must prevail. Accordingly, we affirm the trial court’s ruling granting Carrie the right to enroll Emma in Grace Episcopal School.
 

 Child Support During Summer Months
 

 Bobby also contends the trial court erred by failing to grant a proportionate reduction in the amount of child support owed during the summer. Bobby argues that the court ordered him to pay $350 per month for the months of June and July, an amount which is more than half of his monthly child support obligation.
 

 The record reflects that the trial court granted Bobby visitation with Emma during the summer months as follows: “From
 
 *1033
 
 the first Saturday in June at noon until the fourth Saturday in June at noon; from the third Saturday in July at noon until the second Saturday in August at noon.” Thus, pursuant to the court’s order, Bobby has visitation with Emma for three weeks in June, two weeks in July and two weeks in August. As stated above, the court ordered Bobby to pay child support in the amount of $687 per month and reduced that amount to $350 per month for the months of June and July.
 

 LSA-R.S. 9:315.8(E) provides, in pertinent part:
 

 (1) In cases of joint custody, the court shall consider the period of time spent by the child with the nondomiciliary party as a basis for adjustment to the amount of child support to be paid during that period of time.
 

 [[Image here]]
 

 (3) In determining the amount of credit to be given, the |14court shall consider the following:
 

 (a) The amount of time the child spends with the person to whom the credit would be applied. The court shall include in such consideration the continuing expenses of the domiciliary party.
 

 (b) The increase in financial burden placed on the person to whom the credit would be applied and the decrease in financial burden on the person receiving child support.
 

 (c) The best interests of the child and what is equitable between the parties.
 

 (4) The burden of proof is on the person seeking the credit pursuant to this Subsection.
 

 [[Image here]]
 

 An automatic deviation from the child support guidelines is not allowed.
 
 Guillot v. Munn,
 
 99-2132 (La.3/24/00), 756 So.2d 290;
 
 Jones v. Jones,
 
 38,790 (La.App.2d Cir.6/25/04), 877 So.2d 1061. All that is required by LSA-R.S. 9:315.8(E) is that the trial court consider the period of time spent with the nondomiciliary parent as a basis for adjustment of the child support obligation.
 
 Jones, supra; Falterman v. Fatterman,
 
 97-192 (La.App. 3d Cir.10/8/97), 702 So.2d 781,
 
 writ not considered,
 
 98-0076 (La.3/13/98), 712 So.2d 863. The statute does not mandate an adjustment for time spent, nor does it remove from the trial court the discretion to decide whether to make an adjustment.
 
 Id.
 
 There is no hard and fast rule to determine just how much, if any, to reduce the child support obligation based on the percentage of time the children live with either parent.
 
 Id.
 

 In the instant case, pursuant to LSA-R.S. 9:315.8(E), the court was required to take into consideration the period of time Emma is in Bobby’s custody those months, as well as Carrie’s continuing expenses. However, |1Bthe court was not statutorily mandated to adjust Bobby’s support obligation at all; the statute expressly leaves it to the discretion of the trial court to make any adjustments. The trial court did not explain how it arrived at the calculation of Bobby’s child support obligation during the months of June and July. However, it appears that the court considered Bobby’s support obligation for the remaining months — $687 per month; divided that figure in half ($343.50), and rounded the figure up to $350. There is no showing that the court abused its discretion in doing so. Thus, we conclude that the trial court did not abuse its discretion in ordering Bobby to pay $350 in child support for the months of June and July.
 

 Expense Sharing
 

 Bobby further contends the trial court failed to consider “additional income” that Carrie incurs by sharing household expenses with her current husband. Bobby argues that prior to her
 
 *1034
 
 current marriage, Carrie paid a monthly house payment in the amount of $750, but her current housing expenses are paid by her current husband.
 

 In determining income, the court may consider as income the benefits a party derives from expense-sharing or other sources; however, in determining the benefits of expense-sharing, the court shall not consider the income of another spouse, regardless of the legal regime under which the remarriage exists, except to the extent that such income is used directly to reduce the cost of a party's actual expenses. LSA-R.S. 9:315(C)(5)(c). The language of the statute is permissive, not mandatory. As such, it is within the trial court’s discretion to include or disallow alleged expense-sharing | , (¡benefits. Such determination will not be disturbed absent an abuse of that discretion.
 
 Evans v. Evans,
 
 36,731 (La.App.2d Cir.11/6/02), 830 So.2d 591;
 
 Hutto v. Kneipp,
 
 627 So.2d 802 (La.App. 2d Cir.1993).
 

 The above mentioned statute provides that a trial court is not required to consider the benefits a party receives from expense sharing. There was no direct evidence in this case to indicate the extent to which the income of Carrie’s current husband may have allegedly reduced her actual expenses. Carrie testified that she and her current husband do not have a joint bank account. She also testified her husband writes the checks for their monthly mortgage payments from his separate account and she pays some of the bills of the household from her separate account. Rick, Carrie’s current husband, testified that although he writes the checks for their household expenses from his personal account, Carrie reimburses him for expenses from her separate funds. He testified as follows:
 

 Q: What, if any, contribution to the household expenses does Carrie make?
 

 A: Well, it depends on what’s up on that month. She’ll — I’ll normally tell her that I need X number of dollars to take care of something. ... You know, when I was looking at the budget to see if we could afford the house that we were looking at, I put
 
 everything
 
 down and I knew that she was paying rent and things in West Monroe. So, I utilized kind of that money. And it’s almost transferred, if you will. But, you know, that’s just kind of the way we do it.
 

 Q: [Jjust generally speaking, you were aware of what expenses your wife had before you married?
 

 A: Yes, sir.
 

 Q: And did that factor in the budget that you set up 117when you decided to buy the house and borrow the money you borrowed and set up the payment plan?
 

 A: You better believe it.
 

 Q: And so does she make a contribution to the household expenses?
 

 A: Absolutely.
 

 The trial court elected not to impute additional income to Carrie because of any alleged shared expenses with her current spouse. Likewise, we must point out that the court did not impute any additional income to Bobby because of any alleged shared expenses with his current spouse. We find that the trial court did not abuse its discretion. This assignment lacks merit.
 

 Income Tax Dependency
 

 Bobby next contends the trial court erred in awarding the dependency deduction for income tax purposes to Carrie. He argues that he pays 53% of the
 
 *1035
 
 total child support obligation, and the dependency deduction would benefit him greater than it would Carrie because his income is greater than hers.
 

 LSA-R.S. 9:315.18 provides, in pertinent part:
 

 A. The amounts set forth in the schedule in R.S. 9:315.19[
 
 3
 
 ] presume that the custodial or domiciliary party has the right to claim the federal and state tax dependency deductions and any earned income credit. However, the claiming of dependents for federal and state income tax purposes shall be as provided in Subsection B of this Section.
 

 |18B. (1) The non-domiciliary party whose child support obligation equals or exceeds fifty percent of the total child support obligation shall be entitled to claim the federal and state tax dependency deductions if, after a contradictory motion, the judge finds both of the following:
 

 (a) No arrearages are owed by the obli-gor.
 

 (b) The right to claim the dependency deductions or, in the case of multiple children, a part thereof, would substantially benefit the non-domiciliary party without significantly harming the domiciliary party.
 

 In this case, the trial court determined that Bobby pays 53% of the child support obligation. However, the statute clearly states that Bobby, the nondomiciliary parent, would be entitled to claim the dependency deduction
 
 if
 
 the court had found that the right to claim the deduction would substantially benefit Bobby without significantly harming Carrie. Bobby presented no evidence to prove that the income tax deduction would substantially benefit him, without substantially harming Carrie. See,
 
 Neill v. Neill,
 
 33,398 (La.App.2d Cir.6/21/00), 764 So.2d 235. Accordingly, we find no error in the trial court’s allocation of the tax deductions to Carrie.
 

 CONCLUSION
 

 For the above reasons, the judgment of the trial court is affirmed. Costs are assessed to the appellant, Robert Keith Sem-ines, IV.
 

 AFFIRMED.
 

 [1]
 

 . The judgment of divorce was signed on January 30, 2006.
 

 [2]
 

 . LSA-C.C. art. 134 provides, in pertinent part:
 

 Such factors may include:
 

 (1) The love, affection, and other emotional ties between each party and the child.
 

 (2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
 

 (3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
 

 (4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
 

 (5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
 

 (6) The moral fitness of each party, insofar as it affects the welfare of the child.
 

 (7) The mental and physical health of each parly.
 

 (8) The home, school, and community history of the child.
 

 (9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
 

 (10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
 

 (11) The distance between the respective residences of the parties.
 

 (12) The responsibility for the care and rearing of the child previously exercised by each party.
 

 [3]
 

 . The schedule of support to be used for determining the basic child support obligation is set forth in LSA-R.S. 9:315.19.